HARTWELL et al. v. DELAWARE, L.' & W. R. CO,

(District Court, N. D. New York.   July 22, 1916.)

1. RAILROADS ⊙⟷328(1)—CROSSING ACCIDENTS—DUTY OF CARE.
    One about to drive from behind a railroad station onto the track, who
    could not see the tracks for any great distance, is bound to look and
    listen before venturing on the tracks and, if necessary, to stop.

    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§· 1057, 1060,
    1069;  Dec. Dig. ⊙⟷328(1).]

2. RAILROADS ⊙⟷347(2)—CROSSING ACCIDENTS—NEGLIGENCE.
    Where the tracks of two railroad companies ran parallel and only a
    short distance apart, so that travelers on the highway could not dis-
    tinguish whether a train was on one track or another, evidence that it
    was customary to equip much traveled crossings with an automatic bell
    is admissible in an action for the killing of a traveler at the crossing by
    a train, but the absence of a bell will not, as a matter of law, establish
    the company's negligence.

    [Ed. Note.—For other cases, see ,Railroads, Cent. Dig. § 1125;  Dec.
    Dig. ⊙⟷347(2).]

3. RAILROADS ⊙⟷350(1, 13)—CROSSING ACCIDENTS.
    In an action for the death of one run down at a railroad crossing,
    questions of the railroad company's negligence and of deceased's contrib-
    utory negligence held, under the evidence, for the jury.

    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152, 1166;
    Dec. Dig. ⊙⟷350(1, 13).]

4. NEW TRIAL ⊙⟷44(3)—MISCONDUCT OF JURORS.
    Before a map, showing the crossing at which deceased was run down by
    defendant's train, was put in evidence, it was hung up in plain sight of
    the jury, and some of the jurors, their attention having been directed to
    it, examined it before it was introduced in the evidence.   The attention
    of the court being called, the jurors were told that it was improper for
    them to examine or consider the map until it was placed in evidence, and
    they immediately desisted.   Held, that as the map was subsequently put
    in evidence, that the jurors had previously examined it, coupled with
    the fact that they were heard discussing the case without any show-
    ing of the nature of the discussion, does not warrant a new trial, the
    court directing them not to discuss the case before it was submitted to
    them, because it must be assumed that the jurors do their duty.

    [Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 82–84;  Dec.
    Dig. ⊙⟷44(3).]

At Law.   Action by Edward H. Hartwell and another, as adminis-
trators of the estate of Grace E. Hartwell, deceased, against the Dela-
ware, Lackawanna & Western Railroad Company.   There was a ver-
dict for defendant, and plaintiffs move for new trial.   Motion denied.

Motion to set aside the verdict of the jury in favor of the defendant
and for an order directing a new trial on the grounds of error in the
admission and rejection of offered evidence; that the verdict was con-
trary to the evidence; but principally on the ground of misconduct of
certain of the jurors in examining a map showing the place of the acci-
dent with distances and structures before same was part of and of-
fered in evidence, and in discussing the case in the corridors of the

⊙⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

courthouse during the progress of the trial, and not in the presence of the court, and before the case was finally submitted to the jury.

Stephen Holden, of Mt. Vernon, N. Y., for the motion.

Thomson & Byrne, of Syracuse, N. Y., opposed.

RAY, District Judge. The negligence of the defendant alleged in the complaint was failure to ring the bell on the engine and blow the whistle, thereby giving warning to the plaintiffs' intestate of the approach of the defendant's passenger train, running past the station at Galena, N. Y., without stopping, at the rate of about 30 or 40 miles per hour. Early in the trial, and after the jury had been impaneled and sworn, the plaintiffs offered evidence, and proposed to give evidence, showing that there was in use at the time of the accident in question a gong or bell, located at railroad crossings on defendant's road and on other railroads, and well known, which would give notice and warning to persons about to cross the tracks, operated by the train itself as it approached the crossing, but that no such gong or bell had been installed or was in use at the crossing in question, and that the conditions were such as to make the installation of such bell or gong reasonably necessary, and that its absence was negligence on the part of the defendant in view of all the circumstances and surroundings and was the proximate cause of the collision and injury to the plaintiffs' intestate which resulted in her death, even if the bell was rung and the whistle was sounded. As no such negligence on the part of the defendant railroad company had been pleaded unless by mere suggestion, the court permitted an amendment to the complaint, fully covering that proposition, and then allowed proof that such gongs or bells were installed and in use at similar railroad crossings, not only by the defendant company, but by other railroad companies, and were a well-known appliance for giving warnings to travelers on the public highway about to pass over railroad crossings.

At Galena, a small hamlet in the town of North Norwich, about 6 miles north of the city of Norwich and for a distance of at least half a mile northerly and southerly from the station at that point, the Delaware, Lackawanna & Western Railroad tracks and the New York, Ontario & Western Railroad tracks parallel each other at a distance of about 100 feet from each other. The tracks of the Delaware, Lackawanna & Western Railroad are laid on a fill, and are at least 3, 4, or 5 feet higher at the highway crossing than those of the New York, Ontario & Western Railroad. A public highway running easterly and westerly crosses the tracks of both railroads leading from Galena westerly to Plymouth and South Plymouth some 5 or 6 miles distant. This highway is traveled mainly by farmers. The station at Galena of the Ontario & Western Railroad Company is north of this highway, and on the westerly side of its tracks, while the station of the Delaware, Lackawanna & Western Railroad Company is on the easterly side of its tracks, and some 12 or 15 feet south of the traveled part of this public highway. The depot of the defendant company is about 40 feet long, parallel with the tracks, and 20 feet wide, and its platform, 10 feet in width, extends to within 3 feet of the most easterly rail of

234 F.—8

the tracks. This depot is built into the side of the fill on which the tracks are laid, so that the easterly side of the depot is 3 or 4 feet lower down than the platform in front on a level with the tracks. At a distance of about 1,000 feet south of the depot there is a curve, which prevents a person at the depot and on the easterly side thereof from seeing whether a train approaching from the south is on the defendant's tracks or on the tracks of the Ontario & Western Railroad Company, which are east of the defendant's tracks. A person on the easterly side of the depot can see a train approaching from the south for 2,000 feet at least, but cannot determine whether the engine and train approaching is on the one road or the other, even if familiar with the locality. A passenger train passes north on the Ontario & Western Railroad nine minutes ahead of the train moving north on the defendant's road at about 4:50 p. m. each day.

The depot of the defendant railroad company at Galena is a combination depot, and used for passengers, freight, and express matter, so that people come and go at any hour of the day or evening, and are notified and permitted so to do by the railroad company. The ground is open and well trodden and beaten from the highway proper up to the north end of the depot all along on its easterly side and for some few rods on the south side of the depot, and here people drive in, and are accustomed to drive in, and are invited to drive in, for the purpose of receiving and discharging freight and express matter. It is obvious that a person on the easterly side of the depot and near thereto, even if he or she heard the sound of an engine whistle or the ringing of a bell, and even if they saw the approaching engine at a distance of 2,000 feet, would be uncertain which road the approaching train was on. Such was the situation on the day of the accident in question which resulted in the death of Grace Hartwell and of her aunt, who was in the buggy with her.

It appeared from the evidence and was uncontradicted that shortly before the north-bound train of the defendant company reached the Galena station, Grace Hartwell, the plaintiffs' intestate, with her aunt by her side in a buggy with the top up and back curtain down, but with no side curtains, drove in on the easterly side of the defendant's depot to the large doors near the south end and discharged a crate of eggs for shipment on the defendant company's road, either as freight or by express. The defendant's station agent acts both in that capacity and to receive and deliver express matter. A Mr. Frink, who was there for the purpose of receiving and conveying to the post office the mail bag when thrown from the train, was also present and assisted in discharging the eggs. The station agent and Frink testified that as the eggs were being discharged, or just as they had been discharged—and the latter seems to have been the fact—the sound of a train and the whistle of an engine approaching from the south was heard. The station agent remarked, as he testified, "There comes a train on our road," and Miss Hartwell remarked to the effect that, "You always have a train when I am here," or "Almost always have a train when I am here." Miss Hartwell was to have a receipt, and the station agent left the door on the east side and passed to the westerly side, where

the train would pass, and thence along the platform to the door where passengers enter and then into his little office, for the purpose of drawing a receipt, and just then the train went by and struck the horse driven by Miss Hartwell with her aunt by her side, who had driven away from the door on the easterly side, moving first south and then around to her left or easterly, and who had driven the length of the depot and turned into the northerly side of the highway westerly, and was in the act, when her horse was struck, of driving over the defendant's tracks. As the railroad agent left Miss Hartwell to draw the receipt, he made a remark to the effect that she could go away or move away.

Two witnesses called by the plaintiffs testified that they were looking and observing and in a position to hear and see, but that they neither heard the bell nor whistle of the approaching train, although they saw it. The defendant called at least a dozen witnesses in addition to several employés of the railroad company, who testified that they were in a position to see and hear all that took place, and that they saw the approaching train and plainly heard the whistle which was a long, loud blast, but most of them testified that they did not hear the bell. The employés on the train testified, however, that the bell was rung continuously. If the whistle was blown, and the evidence was overwhelming to that effect, it must have been heard at the depot and by Miss Hartwell, if she was paying any attention whatever. Considering the distance she must have traveled before her horse was struck, it is very doubtful that the approaching train was in sight when she drove away from the door on the easterly side of the depot, and she had to go south a little distance, turn to the left and east, and then drive more than the length of the depot, and then more than its width, to bring her horse head and shoulders onto the track. She could not have moved rapidly in making these movements, and, considering the speed of the train, it is plain, I think, that she did not see the engine approaching. If she did, she could not have known which road the approaching train was on, as it is impossible to determine that fact from the position she was in at the time she made the turn to drive back around the depot into the highway and thence cross the track to the west. She may have heard the whistle, and it is possible that she saw the approaching train or engine, but believed it was on the Ontario & Western Road, and not on the Delaware, Lackawanna & Western tracks. In either event, it was her duty, of course, to proceed with care and caution, and to look and listen as she approached the defendant's tracks at the northerly end of the depot.

Miss Hartwell lived at Sherburne Four Corners, about 2 miles north of Galena, and near to and within plain sight of the Ontario & Western Railroad tracks, but not near or within sight of the defendant's tracks, as the Lackawanna road passes over the Ontario & Western and moves off to the east before reaching Sherburne Four Corners. The station agent lived nearer to the Ontario & Western tracks or road than to the Lackawanna tracks, and it was contended on the trial, and is quite probable, that Miss Hartwell understood the remark of the station agent, "There comes a train on our road," as a statement that the train was approaching on the Ontario & Western tracks, and not on the defendant's road, and that for this reason she was misled and turned

to the west instead of the east. However, there was evidence tending to show that on prior occasions, when coming to the depot, she had driven over the Lackawanna tracks to a watering place for the purpose of watering her horse and on other occasions to call on a friend living near by.

[1-3] The evidence clearly showed that after turning round, and while moving northerly along by the side of the depot, towards the highway, and while passing the northerly end of the depot in the highway, Miss Hartwell could not have seen the approaching train, going, as it did, from the south to the north. After turning into the highway, while proceeding westerly to cross the defendant's tracks, the head and shoulders of the horse would have been upon the easterly rail of the defendant's road before Miss Hartwell could have seen past the northwest corner of the depot far enough to see an approaching train more than 100 or 200 feet away. This situation was apparent to her, and called for care and caution on her part, and if she heard the noise of a train, either the roar or of the whistle, it was her duty to exercise great care by looking and listening, and, in this case, perhaps stopping before going upon the tracks. It is obvious that the added precaution on the part of the railroad company of adding one of the gongs or bells to its warnings of the approach of its trains would have notified Miss Hartwell that a train was approaching from the one direction or the other on the defendant's tracks. The absence of such a warning by bell or gong located at the crossing was not however negligence as matter of law. It was evidence proper to submit to the jury, and it was for the jury to say whether, considering the situation, due care on the part of the defendant required it to establish such a bell at this crossing. That question, with others, was submitted to the jury. Mr. Byrne, for the defendant, excepted to the charge, to the effect:

"That if the jury found that this whistle was blown and the bell rung, then under those circumstances they might find negligence in not having a gong there in view of the situation at the crossing."

The court said and charged then:

"Yes, under all the circumstances and surroundings. Of course, before you come to that fact, you would have to find that the ringing of the bell and the sounding of the whistle at such a place was not sufficient warning; you would have to find that of course. The duty is to give reasonably adequate warning, use due care."

The jury was plainly instructed that if they found, considering all the circumstances and surroundings, that the ringing of the bell and sounding of the whistle on the train was not reasonable and ordinary care to be exercised at such a crossing, then they might find negligence in not having a gong at the crossing. The jury was plainly charged that, even if the railroad company was negligent in not sounding the bell and whistle, one or both, and in not having a gong, if in view of all the circumstances Miss Hartwell knew of or had reason to apprehend the approach of a train on the defendant's tracks, it was her duty to look and listen and perhaps stop, and that if she was guilty of contributory negligence, or negligence which contributed to her injury and death, then the plaintiffs could not recover.

[4] I do not think any competent evidence offered by the plaintiffs was rejected, or that any incompetent or improper evidence offered by the defendant was received. I think the question of the negligence of the defendant company, as well as the question of contributory negligence on the part of Miss Hartwell, were for the jury, and peculiarly for the jury to determine, and that their verdict should not be disturbed unless on the ground that the jury, or some of them, improperly discussed the case out of court during the trial, or got wrong impressions by looking at the map to which reference has been made. The map in question had been drawn to a scale by a civil engineer employed by the defendant, and who was subsequently sworn and fully explained it. It was then placed in evidence and frequently referred to during the trial. At the beginning of the trial this map was hung up without objection in plain sight of the jury, for purposes of reference, and at the time it was examined by some of the jurors, before it went in evidence, it had been referred to and the attention of the jury called to it without objection. The court dismissed the jury at an early stage of the trial, and before the map went into evidence, or was offered, but was proceeding with some other business when its attention was called by the clerk to the fact that some of the jurors were examining the map and conversing among themselves. The court immediately called their attention to the fact that it was not in evidence, and that it was improper to examine the map until it had been explained and put in evidence. The jurors immediately departed. This court is of the opinion that no harm was done, and that no harm could have been done, inasmuch as the map was thereafter fully explained and described by the sworn testimony of the civil engineer, and that of other witnesses to an extent, and there was no dispute or question as to its accuracy. The affidavits submitted show that at a subsequent stage of the trial some of the jurors were heard discussing the case in the corridors of the courthouse, but what was said does not appear, and it does not appear that any opinions were expressed, or that the evidence was under discussion or the credibility of the witnesses or the facts. So far as appears, the discussion may have been as to the length of the trial, etc. The jury had been cautioned, and was cautioned at each recess for the day, not to discuss the case among themselves, or to listen to any discussion from others, or by others, or remarks concerning the case. The presumption is that the jurors do their duty, and that they refrain from any discussion of the merits of the case or the weight or bearing of the evidence until the case is summed up and submitted under the charge of the court for final consideration and determination in the jury room.

The day was clear, and there was no wind, and it was broad daylight. Miss Hartwell, as the evidence showed, was not unfamiliar with the depot and its surroundings. It is evident that the jury either found that the defendant was not negligent; that is, that it sounded the whistle in due time, and that the situation and surroundings were such that the installation of a gong or bell operated by the approaching train was not necessary at this crossing, or that having found the railroad company negligent it further found that Miss Hartwell was her-

self guilty of negligence which contributed to the injury. There was sufficient evidence to establish negligence, but there was also sufficient evidence to establish contributory negligence; and, as the jury was fully and carefully instructed on every point, and no exception was taken to the charge, and I find no error in the admission or rejection of testimony, and it does not affirmatively appear that there was improper action prejudicial to plaintiffs on the part of the jurors, or any of them, during the progress of the trial, the court feels compelled to deny the motion to set aside the verdict and for a new trial.

So ordered.